SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Riley v. New Jersey State Parole Board** (A-94-11) (069327)

**Argued January 7, 2014 -- Decided September 22, 2014**

**ALBIN, J., writing for a majority of the Court.**

In this appeal, the Court must determine whether the 2007 Sex Offender Monitoring Act (SOMA), N.J.S.A. 30:4-123.89 to -123.95, when applied to an individual whose offense was completed before its enactment, violates the constitutional prohibition on ex post facto laws.

In September 1986, George Riley was convicted of second-degree attempted sexual assault of a minor.  In light of his previous sexual-offense convictions, Riley was sentenced to an extended term of twenty years subject to a ten-year parole-ineligibility period, consecutive to a term of imprisonment imposed for a violation of his parole.  At the time, New Jersey law did not provide for the imposition of parole supervision for life for sexual offenses.  On his release in February 2009, he was not subject to any form of parole supervision, but was, however, subject to the registration and notification requirements of Megan's Law.  In July 2009, the Superior Court conducted a Megan's Law hearing and, based primarily on his previous sexual-offense convictions, placed Riley in Tier 3 -- the highest risk category for sexual offenders -- requiring Internet registration and the most comprehensive degree of community notification.

In August 2009, the New Jersey State Parole Board informed Riley that he was subject to GPS monitoring under SOMA.  Under protest, Riley signed the Notice of Conditions for the GPS Monitoring Program.  Riley was told that he would have to wear an ankle bracelet twenty-four hours a day for the rest of his life, that his movements would be tracked continuously by global positioning system (GPS) satellites, and that he would be assigned a monitoring parole officer.  The ankle unit must be plugged into an electrical outlet to be charged one to two hours every day and during that time Riley's movements are limited to the length of the cord.  Riley's failure to comply with the program would subject him to prosecution for a third-degree crime.

Riley filed an appeal with the Parole Board, challenging the imposition of the SOMA requirements.  He characterized the GPS monitoring program as nothing less than parole supervision for life and claimed that this arbitrarily extended sentence violated the Ex Post Facto Clauses of the United States Constitution and the New Jersey Constitution.  The Chairman of the Parole Board wrote to Riley that as a result of his Tier 3 designation, his "placement [in] the Sex Offender G.P.S. Monitoring Program is mandated by statute" and that his failure to comply with the program's rules and regulations would constitute a third-degree crime.  Riley appealed.

The Appellate Division, in a split decision, reversed the Parole Board and held that the retroactive application of SOMA to sex offenders who committed their crimes before passage of the Act violates the Ex Post Facto Clauses of the Federal and State Constitutions.  Riley v. N.J. State Parole Bd., 423 N.J. Super. 224, 228 (App. Div. 2011).  The majority accepted that the Legislature's intent in passing SOMA was to create "a civil scheme that is primarily regulatory" in nature.  Id. at 237.  The majority, however, determined that the adverse effects of SOMA were so punitive that they "constitute[d] retroactive punishment prohibited by the Ex Post Facto Clause."  Id. at 238.

Judge Parrillo dissented, finding no ex post facto violation in applying SOMA to Riley.  Id. at 246.  Judge Parrillo maintained that Riley failed to establish that SOMA's "effects are sufficiently punitive to transform its civil remedy into criminal punishment."  Id. at 258.  Judge Parrillo reasoned that the GPS monitoring program "is sufficiently distinguishable from probation, parole or supervised release so as not to come within the constitutional ex post facto proscription."  Id. at 252.

The Parole Board filed a notice of appeal as of right as a result of the dissent in the Appellate Division.  See R. 2:2-1(a).  The sole issue on appeal as of right is whether SOMA, when retroactively applied to Riley based on his

1986 offense, is punitive in effect and therefore violative of the Ex Post Facto Clause. The Court also granted the Parole Board's petition for certification, 209 N.J. 596 (2012), in which the Board claims that SOMA, passed in 2007, was triggered by Riley's 2009 Tier 3 Megan's Law designation and therefore was not applied retroactively.

**HELD:** The retroactive application of the 2007 Sex Offender Monitoring Act to George Riley twenty-three years after he committed the sexual offense at issue and after he fully completed his criminal sentence violates the Ex Post Facto Clauses of the United States and New Jersey Constitutions.

1. The United States Constitution and the New Jersey Constitution both prohibit the State Legislature from passing an "ex post facto law." U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3. For a law to violate the ex post facto prohibition, a court must find that the law is "retrospective" and that it imposes additional punishment to an already completed crime. Even if the Legislature's "intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." Smith v. Doe, 538 U.S. 84, 92 (2003). To determine the "effects" of a statute for ex post facto purposes, the United States Supreme Court found "as a useful framework" seven factors referred to in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 (1963), a case involving a double-jeopardy challenge. In Smith, the Court looked at five of those factors to determine whether the Alaska sex-offender registry scheme "in its necessary operation" (1) "has been regarded in our history and traditions as a punishment"; (2) "imposes an affirmative disability or restraint"; (3) "promotes the traditional aims of punishment"; (4) "has a rational connection to a nonpunitive purpose"; or (5) "is excessive with respect to this purpose." Smith, supra, at 97. The Court noted that, unlike the registration and notification law, probation or supervised release curtailed an individual's right "to live and work as other citizens" without supervision. Id. at 101. Community supervision for life and its corollary parole supervision for life are merely indefinite forms of parole, and this Court has ruled that community supervision for life "is punitive rather than remedial." State v. Schubert, 212 N.J. 295, 308 (2012). (pp. 17-27)

2. The Court rejects the Parole Board's argument that it was the 2009 Tier 3 high-risk designation and not the offense conduct that triggered the GPS monitoring. The Board's reasoning is not supported by United States Supreme Court jurisprudence. At the Megan's Law hearing, the court made no independent assessment of Riley's current dangerousness unrelated to his prior convictions. The predicate events responsible for Riley's current regime of GPS monitoring are his 1986 sexual offense and earlier offenses. The question is whether SOMA can retroactively apply to completed conduct without offending the Constitution. (pp. 27-29)

3. The issue is whether, despite the remedial intent of the Legislature, SOMA's adverse effects are "so punitive either in purpose or effect as to negate the State's intent to deem it only civil and regulatory." Smith, supra, at 92. If the real world effects of the twenty-four-hour GPS monitoring regime on Riley's life are unmistakably punitive in nature, the Ex Post Facto Clause will bar retroactive application of SOMA. In applying the five Mendoza-Martinez factors considered most relevant in Smith, the Court notes that there are no direct historical analogues to a twenty-four-hour-a-day electronic surveillance that can track an individual's every movement. Parole, more particularly parole supervision for life, is the closest analogue to SOMA. SOMA looks like parole, monitors like parole, restricts like parole, serves the general purpose of parole, and is run by the Parole Board. Calling this scheme by another name does not alter its essential nature. SOMA "imposes an affirmative disability or restraint," id. at 97, and clearly impinges on Riley's "freedom to travel," which "has long been recognized as a basic right under the Constitution." See United States v. Guest, 383 U.S. 745, 758 (1966). SOMA's grant of authority to parole officers to gain access to Riley's home is also an incursion into Riley's Fourth Amendment privacy rights. SOMA's twenty-four-hour surveillance of Riley and onerous restrictions deprive him of freedom of movement and the ability "to live and work as other citizens, with no supervision." Smith, supra, at 100-01. SOMA's adverse effects are "so punitive . . . as to negate the State's intent to deem it only civil and regulatory." Id. at 92. The retroactive application of SOMA to George Riley twenty-three years after he committed the sexual offense at issue and after he fully completed his criminal sentence violates the Ex Post Facto Clauses of the United States and New Jersey Constitutions. (pp. 30-37)

The judgment of the Appellate Division is **AFFIRMED** and the matter is **REMANDED** to the New Jersey State Parole Board for enforcement of this judgment.

**CHIEF JUSTICE RABNER** filed a separate, **DISSENTING** opinion, in which **JUSTICES PATTERSON** and **FERNANDEZ-VINA** join, substantially for the reasons expressed in Judge Parrillo's dissenting opinion.

**JUSTICE LaVECCHIA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion. CHIEF JUSTICE RABNER and JUSTICES PATTERSON and FERNANDEZ-VINA filed a separate, dissenting opinion.**

GEORGE C. RILEY,

    Appellant-Respondent,

       v.

NEW JERSEY STATE PAROLE
BOARD,

    Respondent-Appellant.

Argued January 7, 2014 – Decided September 22, 2014

On certification to the Superior Court,
Appellate Division, whose opinion is
reported at 423 N.J. Super. 224 (2011).

Lisa A. Puglisi, Assistant Attorney General,
argued the cause for appellant (John J.
Hoffman, Acting Attorney General of New
Jersey, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Ms.
Raksa, Christopher C. Josephson, Deputy
Attorney General, and Mary Beth Wood, Senior
Deputy Attorney General, on the briefs).

Stephen M. Orlofsky argued the cause for
respondent (Blank Rome, attorneys; Mr.
Orlofsky, Andrew J. Hughes, and Rachel J.
Gallagher, on the briefs).

Alexander R. Shalom argued the cause for
amici curiae American Civil Liberties Union
of New Jersey and New Jersey Office of the
Public Defender (Alison S. Perrone,
attorney).

George C. Riley submitted a letter brief pro
se.

JUSTICE ALBIN delivered the opinion of the Court.

A well-established principle of ancient origin is that the legislature cannot increase the punishment for a crime after it has been committed.  This simple principle -- that after-the-fact laws cannot raise the punishment for earlier committed conduct -- is embodied in the Ex Post Facto Clauses of both the Federal and New Jersey Constitutions, U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3.

In 2009, George C. Riley, then seventy-six years old, completed serving the entirety of his twenty-year sentence for aggravated sexual assault.  On his release from prison, Riley was under no form of parole supervision, although he was required to comply with the registration and notification provisions of Megan's Law, N.J.S.A. 2C:7-1 to -11.  Six months later, the New Jersey Parole Board advised Riley that he was subject to the Sex Offender Monitoring Act (SOMA), N.J.S.A. 30:4-123.89 to -123.95 -- a law passed in 2007, more than twenty years after Riley committed his last offense.  Riley was told that he would have to wear an ankle bracelet twenty-four hours a day for the rest of his life, that his movements would be tracked continuously by global positioning system (GPS) satellites, and that he would be assigned a monitoring parole officer to whom he would have to report and give access to his home.  This monitoring program placed restrictions on Riley's

2

freedom to travel, and his failure to comply with the program would subject him to prosecution for a third-degree crime.

Before the Parole Board, Riley claimed that the retroactive application of SOMA to him, based on his 1986 conviction, violated the bar against ex post facto laws. He contended that the new law is a form of parole supervision for life, an additional punishment imposed after he completed his sentence. The Chairman of the Parole Board rejected Riley's challenge, explaining that he was carrying out the mandate of the statute. The Appellate Division reversed in a split decision, finding that the retroactive application of SOMA to Riley based on his 1986 conviction constituted punishment under both the Federal and State Ex Post Facto Clauses.

We now affirm. Parole is a form of punishment under the Constitution. SOMA is essentially parole supervision for life by another name. Riley is under constant electronic monitoring by the Parole Board even though he has completed his sentence for a crime that predated SOMA. The constraints and disabilities imposed on Riley by SOMA, and SOMA's similarity to parole supervision for life, clearly place this law in the category of a penal rather than civil law. Accordingly, when applied to Riley, SOMA violates both the federal and state constitutional guarantees against ex post facto laws.

I.

3

A.

The facts of this case are generally not in dispute. In September 1986, George Riley was convicted of the second-degree attempted sexual assault of a minor that he committed earlier that year, in violation of N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2(b). In light of his previous sexual-offense convictions, Riley was sentenced to an extended term of twenty years subject to a ten-year parole-ineligibility period, consecutive to a term of imprisonment imposed for a violation of his parole. At the time, New Jersey law did not provide for the imposition of parole supervision for life for sexual offenses.

Riley completed the entirety of his sentence in prison. On his release in February 2009, he was not subject to any form of parole supervision. Riley was, however, subject to the registration and notification requirements of Megan's Law. In July 2009, the Superior Court conducted a Megan's Law hearing for the purpose of determining the extent of community notification. The court placed Riley in Tier 3 -- the highest risk category for sexual offenders -- requiring Internet registration and the most comprehensive degree of community notification. See N.J.S.A. 2C:7-8(c)(3); N.J.S.A. 2C:7-13(b)(1). The Tier 3 scoring was based primarily on Riley's previous sexual-offense convictions. Megan's Law registration

4

and notification requirements do not place an offender under parole supervision.

In August 2009, Riley received notification from the New Jersey State Parole Board that he was subject to GPS monitoring under SOMA.  Under protest, Riley signed the Notice of Conditions for the GPS Monitoring Program.  The Notice set forth the following requirements:

> 1.  You shall initially meet with the assigned monitoring Parole Officer for installation of the GPS monitoring equipment.
>
> 2. You shall insure that the GPS tracking device is charged to its capacity on a daily basis and maintain the GPS tracking device in a charged mode whenever you leave your residence.
>
> 3. You shall provide immediate notice to the assigned monitoring Parole Officer if the GPS tracking device becomes inoperable.
>
> 4. You shall not tamper with, remove or damage or attempt to tamper with, remove or damage any of the GPS monitoring equipment installed at your residence, attached to your person or required to be carried by you.
>
> 5. You shall be responsible for the cost of repair and/or replacement of any of the GPS monitoring equipment that is lost or damaged.
>
> 6.  You shall maintain and exercise continuous physical control over the GPS tracking device whenever you leave your residence.

7.   You   shall   provide   access   to   your residence at reasonable times to enable the assigned   monitoring   Parole   Officer   to perform   required   maintenance   and/or diagnostics of the GPS monitoring equipment.

8.   You   shall   provide   immediate   access   to your   residence   whenever   the   assigned monitoring   Parole   Officer   is   required   to investigate   a   report   of   non-compliance   with a condition of the monitoring program.

9. You shall provide notice to the assigned monitoring Parole Officer not less than ten days prior to any change in your residence.

10. You shall provide notice to the assigned monitoring   Parole   Officer   prior   to   any travel outside of the State of New Jersey.

11.   You   shall   provide   the   assigned monitoring Parole Officer with:

   a.   the   name,   address   and   physical location of your current employment.

   b.   notice   of   any   change   in   your employment   or   employment   location within   24   hours   of   the   change occurring.

   c. your scheduled hours of work on a weekly basis.

The Notice also advised Riley that failure to comply with the conditions constituted a third-degree crime, exposing him to a maximum term of imprisonment of five years and a maximum fine of $15,000.

The assigned parole officer attached a light-weight, two-inch by one-and-one-half-inch transmitter to Riley's ankle using a rubber strap.  Riley is required to wear the transmitter at

6

all times.[1]  At first, when away from home, Riley was required to carry a cell-phone-sized tracking unit that is clipped to a belt.  In June 2013, Riley was given an updated GPS device, combining the transmitter and tracking device into a single ankle bracelet.  This new unit is larger and heavier than the old one.  On the new device, only pre-recorded messages can be sent to Riley.  When receiving a message, Riley must place his finger on a sensor and then the message is broadcast over the device's speaker, wherever he may be.  These messages include, "call your officer," "please pay your fines immediately," and "report to the office immediately."  The new ankle unit must be plugged into an electrical outlet to be charged.  During charging, Riley's movements are limited to the length of the cord.  The tracker must be charged through an electrical outlet one to two hours every day.[2]

The parole officer monitoring Riley can log into a website, pinpoint his location on a map, and determine whether he is moving and, if so, at what speed and in what direction.  The

---

[1] The Appellate Division noted, based on the submissions before it, that Riley, "who is seventy-seven years old, complains that this bracelet causes his leg to swell at night and is very uncomfortable when he sleeps or wears certain shoes."  Riley v. N.J. State Parole Bd., 423 N.J. Super. 224, 239 (App. Div. 2011).

[2] Riley complains that the new device "feels like a weight," causes him pain while sleeping, and will cause him shame and humiliation when he receives a message in a public place.

effectiveness of this tracking mode depends on the satellite and wireless-communication reception at a particular location. Riley, however, is required to notify his parole officer if his tracking device becomes inoperable.

Riley was advised through a New Jersey Parole Board "Participant Information" statement that the "GPS monitoring program is staffed by [p]arole [o]fficers at all times" and that he can reach his parole officer at the District Office telephone number or the officer's cell number.

B.

Riley filed an appeal with the Parole Board, challenging the imposition of the SOMA requirements six months after he "made a successful adjustment into the community without any incident." He characterized the GPS monitoring program as nothing less than parole supervision for life -- a parole requirement for certain sex offenders that post-dated his crime. Riley claimed that the Parole Board arbitrarily extended his sentence after he had completed serving it, in violation of the Ex Post Facto and the Double Jeopardy Clauses of the United States Constitution and the Ex Post Facto Clause of the New Jersey Constitution.

The Chairman of the Parole Board wrote to Riley that as a result of his Tier 3 designation, his "placement [in] the Sex Offender G.P.S. Monitoring Program is mandated by statute" and

8

that his failure to comply with the program's rules and regulations would constitute a third-degree crime.

Riley appealed.

## II.

### A.

The Appellate Division, in a split decision, reversed the Parole Board and held that the retroactive application of SOMA to sex offenders who committed their crimes before passage of the Act violates the Ex Post Facto Clauses of the Federal and State Constitutions. Riley, supra, 423 N.J. Super. at 228. Writing for the two-person majority, Judge Skillman initially found that the retroactive application of SOMA to Riley based on his 1986 crime "'change[d] the legal consequences of acts completed before [SOMA's] effective date,'" (quoting Commonwealth v. Cory, 911 N.E.2d 187, 192 (Mass. 2009)), thus requiring an analysis under the Ex Post Facto Clause. Id. at 232-34. The majority then applied the ex post facto test set forth in Smith v. Doe, 538 U.S. 84, 92, 123 S. Ct. 1140, 1147, 155 L. Ed. 2d 164, 176 (2003). Riley, supra, 423 N.J. Super. at 237.

The majority accepted that the Legislature's intent in passing SOMA was to create "a civil scheme that is primarily regulatory" in nature. Ibid. The majority, however, determined that the adverse effects of SOMA were so punitive that they

9

"constitute[d] retroactive punishment prohibited by the Ex Post Facto Clause." Id. at 238. Judge Skillman focused on two of the seven factors listed in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168, 83 S. Ct. 554, 567, 9 L. Ed. 2d 644, 661 (1963), which should be considered in determining whether a statute is punitive in effect. Riley, supra, 423 N.J. Super. at 239. The majority asserted that SOMA subjects its participants to "disabilities and restraints" similar to those that have "historically been regarded as a punishment," and certainly similar to those found in parole, "a form of punishment that cannot be retroactively imposed or extended without violating the Ex Post Facto Clause." Id. at 241 (citations and internal quotation marks omitted).

Judge Parrillo dissented, finding no ex post facto violation in applying SOMA to Riley. Id. at 246. Judge Parrillo maintained that the Legislature clearly expressed its "intent to create a civil regulatory scheme" in passing SOMA, and that Riley failed to establish that SOMA's "effects are sufficiently punitive to transform its civil remedy into criminal punishment." Id. at 258. He applied the Mendoza-Martinez factors in coming to that conclusion. Id. at 248-58.

In his view, the attachment of a GPS monitoring device to Riley is far less intrusive than either involuntary commitment under the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to

-27.38, or the registration and notification procedures of Megan's Law, N.J.S.A. 2C:7-1 to -11, both of which have been held to be nonpunitive. Id. at 248-49. Judge Parrillo also reasoned that the GPS monitoring program "is sufficiently distinguishable from probation, parole or supervised release so as not to come within the constitutional ex post facto proscription." Id. at 252. Judge Parrillo was persuaded that "there is a rational relationship between New Jersey's GPS program and the non-punitive purpose of protecting the public" and that SOMA's "'sanction' is not excessive in relation to its non-punitive objective merely because its duration is lifelong." Id. at 254-55. He submits that SOMA's "technologically advanced method of tracking sex offenders has no historical antecedent" that would suggest its retroactive application violates the prohibition against ex post facto laws. Id. at 257-58.

## B.

The Parole Board filed a notice of appeal as of right as a result of the dissent in the Appellate Division. See R. 2:2-1(a). The sole issue on appeal as of right is whether SOMA, when retroactively applied to Riley based on his 1986 offense, is punitive in effect and therefore violative of the Ex Post Facto Clause. We also granted the Parole Board's petition for certification, 209 N.J. 596 (2012), in which the Board claims that SOMA, passed in 2007, was triggered by Riley's 2009 Tier 3

11

Megan's Law designation and therefore was not applied retroactively. We also granted the motions of the American Civil Liberties Union of New Jersey and the New Jersey Office of the Public Defender to participate as amici curiae.

## III.

### A.

The Parole Board argues that ex post facto concerns are not raised in this case because SOMA was triggered by Riley's Tier 3 classification in 2009 -- a determination of his "present dangerousness" -- not by his 1986 offense. From that reasoning, the Parole Board concludes that SOMA was not retroactively applied to Riley. Alternatively, the Parole Board asks this Court to reverse based on "the sound reasoning" of Judge Parrillo's dissent. It believes that the majority erred by finding that the punitive effect of SOMA violated the Federal and State Ex Post Facto Clauses despite the "Legislature's civil remedial purpose" in passing SOMA. It criticizes the majority for focusing on only two of the seven Mendoza-Martinez factors. It submits that "[t]he relatively minor inconveniences of the monitoring bracelet and tracker are not more onerous than the requirements of such regulatory schemes" as Megan's Law, N.J.S.A. 2C:7-1 to -11, and the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -27.38, which, when retroactively

12

applied, have been held not to run afoul of the ex post facto prohibition.

B.

Riley contends that SOMA imposes "affirmative disabilities and restraints" similar to those "that have historically been regarded as punishment," and that the retroactive application of SOMA to Riley violates the Ex Post Facto Clauses of both the Federal and State Constitutions. Riley rejects the Parole Board's argument that SOMA was triggered by his Tier 3 sex-offender classification and not by his 1986 conviction. Riley insists that the direct antecedent for his involuntary participation in the GPS monitoring program is his 1986 conviction.

Riley also argues that SOMA is punitive for the same reasons that this Court declared that the community supervision for life statute is punitive: "it 'significantly restricts the manner in which an individual may pursue his daily life'" (quoting State v. Schubert, 212 N.J. 295, 306 (2012)). Riley details the punitive effects of wearing a tracking device attached to his body twenty-four hours a day and the requirements that he report to and be supervised by an assigned parole officer mandated by SOMA. He describes a regime of "continuous surveillance . . . akin to an electronic form of parole." Because SOMA places him on the equivalent of parole

13

supervision for life, Riley concludes that the retroactive application of the statute is a proscribed ex post facto law.[3]

## C.

Amici curiae American Civil Liberties Union of New Jersey and the New Jersey Office of the Public Defender maintain that SOMA imposes conditions akin to parole -- a twenty-four-hour electronic guard, burdensome intrusions into Riley's life, and restraints on his freedom of travel -- and applies those penal

---

[3] Riley advances two additional arguments that are not before this Court. He asserts that the Parole Board's GPS monitoring program is an administrative regulatory regime that was not adopted in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, and therefore is void. Riley did not raise this issue before the Appellate Division, nor did he seek certification of this issue. We therefore will not address the issue.

Riley also asserts that "SOMA's text, structure, and implementing procedures . . . establish that SOMA was intended to be punitive" and therefore is an ex post facto law as applied to him. We choose not to address this issue. We are limited to the issues raised in Judge Parrillo's dissent and in the Parole Board's petition for certification. The members of the appellate panel agreed that the Legislature's intent in passing SOMA was to establish a civil, regulatory scheme; they disagreed only about whether SOMA's effects were punitive in nature. See R. 2:2-1(a)(2) (permitting appeals from "final judgments as of right . . . in cases where, and with regard to those issues as to which, there is a dissent in the Appellate Division"); Gilborges v. Wallace, 78 N.J. 342, 349 (1978) ("[W]here there is a dissent in the Appellate Division, the scope of the appeal . . . is limited to those issues encompassed by the dissent."); R. 2:2-1(b) (permitting appeals on certification).

We note that, since Riley filed his brief, the Parole Board adopted administrative regulations governing SOMA. 46 N.J.R. 79(b) (Jan. 6, 2014) (codified at N.J.A.C. 10A:72-11.5). We do not pass any judgment on those regulations.

conditions to an individual whose offense predates the enactment of SOMA by decades. Amici, like Riley, insist that this retroactive increase of the penal consequences after an offense was completed and after the sentence was served violates "the constitutional proscription against ex post facto laws."

IV.

We must determine whether the 2007 Sex Offender Monitoring Act (SOMA), N.J.S.A. 30:4-123.89 to -123.95, when applied to an individual whose offense was completed before its enactment, violates the constitutional prohibition on ex post facto laws. We begin with a review of SOMA and its regulatory scheme.

SOMA directs the Chairman of the Parole Board, "in consultation with the Attorney General, [to] establish a program for the continuous, satellite-based monitoring of sex offenders," N.J.S.A. 30:4-123.92, "24 hours per day, seven days per week," N.J.S.A. 30:4-123.90. Those sex offenders subject to SOMA include any "person whose risk of reoffense has been determined to be high" -- that is, determined to be within the Tier 3 risk under Megan's Law, N.J.S.A. 2C:7-8. N.J.S.A. 30:4-123.91(a)(1). In July 2009, at a Megan's Law hearing, the Superior Court determined that Riley scored in the Tier 3 category based primarily on his 1986 attempted sexual assault and other previous sexual-offense convictions, making him

15

automatically subject to GPS monitoring under SOMA.  See N.J.S.A. 30:4-123.91(a)(1).

The statute's monitoring system provides for the "continuous" geographical tracking of an offender based on satellite GPS and other technology, for "law enforcement agencies to compare the [location of offenders] with reported crime incidents," and for the Parole Board to determine on a twenty-four-hour basis whether an offender is in compliance with the program's conditions.  N.J.S.A. 30:4-123.92(b), (c).  The Parole Board Chairman is authorized to promulgate guidelines to effectuate the program.  N.J.S.A. 30:4-123.92(d).  Noncompliance with the conditions of the program is punishable as a third-degree crime.  N.J.S.A. 30:4-123.95.

In 2014, the Parole Board promulgated regulations defining the conditions of GPS monitoring under SOMA, which are essentially the same as the Notice of Conditions given to Riley in August 2009.  N.J.A.C. 10A:72-11.5.  We already have described the burdens and restraints placed on Riley resulting from the GPS monitoring program that began with the permanent attachment of a tracking device to his ankle six months after he had completed the entirety of his criminal sentence.

We next turn to the Ex Post Facto Clause jurisprudence.

V.

A.

16

The United States Constitution and the New Jersey Constitution both prohibit the State Legislature from passing an "ex post facto law." U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3. The New Jersey Ex Post Facto Clause is interpreted in the same manner as its federal counterpart. Doe v. Poritz, 142 N.J. 1, 42 (1995). The Ex Post Facto Clause furthers two primary goals. It assures that individuals can rely on laws until they are "'explicitly changed,'" and it restricts the government from passing "'potentially vindictive legislation.'" Carmell v. Texas, 529 U.S. 513, 566, 120 S. Ct. 1620, 1650, 146 L. Ed. 2d 577, 614-15 (2000) (quoting Weaver v. Graham, 450 U.S. 24, 28-29, 101 S. Ct. 960, 964, 67 L. Ed. 2d 17, 23 (1981)).

The Ex Post Facto Clause proscribes "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L. Ed. 648, 650 (1798). Stated slightly differently, "any statute . . . which makes more burdensome the punishment for a crime, after its commission, . . . is prohibited as ex post facto." Beazell v. Ohio, 269 U.S. 167, 169-70, 46 S. Ct. 68, 68, 70 L. Ed. 216, 217 (1925). These formulations, which are "faithful to our best knowledge of the original understanding of the Ex Post Facto Clause," simply bar a legislature from "retroactively alter[ing] the definition of

17

crimes or increas[ing] the punishment for criminal acts." Collins v. Youngblood, 497 U.S. 37, 43, 110 S. Ct. 2715, 2719, 111 L. Ed. 2d 30, 39 (1990).

B.

Two findings must be made for a law to violate the ex post facto prohibition. A court must first determine that the law is "retrospective." Miller v. Florida, 482 U.S. 423, 430, 107 S. Ct. 2446, 2451, 96 L. Ed. 2d 351, 360 (1987) (citation and internal quotation marks omitted).[4] A law is retrospective if it "'appl[ies] to events occurring before its enactment'" or "if it 'changes the legal consequences of acts completed before its effective date.'" Ibid. (quoting Weaver, supra, 450 U.S. at 29, 31, 101 S. Ct. at 964, 965, 67 L. Ed. 2d at 24). Second, the court must determine whether the law, as retrospectively applied, imposes additional punishment to an already completed crime. Kansas v. Hendricks, 521 U.S. 346, 370, 117 S. Ct. 2072, 2086, 138 L. Ed. 2d 501, 520 (1997) (citation omitted).

Assuming that a statute is intended to apply retroactively, determining whether the statute imposes punishment requires a two-part evaluation under the Ex Post Facto Clause. Smith, supra, 538 U.S. at 92, 123 S. Ct. at 1146-47, 155 L. Ed. 2d at 176. First, a court must assess whether the Legislature

---

[4] Courts use the terms "retrospective" and "retroactive" interchangeably.

18

intended "to impose punishment."  Id. at 92, 123 S. Ct. at 1147, 155 L. Ed. 2d at 176.  If the court finds that the Legislature had a punitive intent, "that ends the inquiry."  Ibid.

However, even if the Legislature's "intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil."  Ibid. (alteration, citation, and internal quotation marks omitted).  To determine the "effects" of a statute for ex post facto purposes, the United States Supreme Court found "as a useful framework" seven factors referred to in Mendoza-Martinez, a case involving a double jeopardy challenge. Id. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 179.

The Supreme Court in Smith focused on the five Mendoza-Martinez factors "most relevant" to its analysis of whether the "effects" of the Alaska Sex Offender Registration Act imposed a retroactive punishment violative of the Ex Post Facto Clause. Id. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 180.[5]  The

---

[5] In Poritz, supra, we declined to utilize the Mendoza-Martinez factors in deciding the ex post facto challenge to Megan's Law. 142 N.J. at 72.  Since our 1996 decision in Poritz, the United States Supreme Court issued Smith, supra, applying the Mendoza-Martinez factors in analyzing the constitutionality of Alaska's version of Megan's Law under the Ex Post Facto Clause.  538 U.S. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 179.  Because we have acknowledged that there is no difference in the interpretation of the Ex Post Facto Clause under federal and

Supreme Court looked to whether the sex-offender registry scheme "in its necessary operation" (1) "has been regarded in our history and traditions as a punishment"; (2) "imposes an affirmative disability or restraint"; (3) "promotes the traditional aims of punishment"; (4) "has a rational connection to a nonpunitive purpose"; or (5) "is excessive with respect to this purpose." Ibid.[6] These factors are considered "useful guideposts" and not an "exhaustive [or] dispositive" list. Id. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 179-80 (citations and internal quotation marks omitted). Each factor does not necessarily receive the same weight.

Applying those factors in Smith, the Court upheld Alaska's sex offender registration and notification statute against an ex post facto challenge, finding that it was a civil regulatory scheme with nonpunitive effects. The Court concluded that the statute did not impose physical restraints on sex offenders, left them free to "change jobs [and] residences," and "to move where they wish and to live and work as other citizens, with no supervision." Id. at 100-01, 123 S. Ct. at 1151-52, 155 L. Ed.

---

state law, we follow the reasoning of Smith, the most recent exposition on the Clause.

[6] In the ex post facto analysis in Smith, supra, the Supreme Court determined that two of the seven Mendoza-Martinez factors "are of little weight": whether the relevant behavior is already a crime and whether the regulation requires a finding of scienter. 538 U.S. at 105, 123 S. Ct. at 1154, 155 L. Ed. 2d at 185.

2d at 181-82 (emphasis added). The Court observed that the registration and notification law imposed obligations "less harsh than the sanctions of occupational debarment, which [the Court has] held to be nonpunitive." Id. at 100, 123 S. Ct. at 1151, 155 L. Ed. 2d at 181.

In an earlier case, the Supreme Court determined that the retroactive application of a Kansas statute allowing for the civil commitment of sexually violent predators did not violate the Ex Post Facto Clause. Hendricks, supra, 521 U.S. at 371, 117 S. Ct. at 2086, 138 L. Ed. 2d at 520-21. Under the Kansas statute, commitment of a convicted offender occurs only if the State shows that he "suffers from a mental abnormality or personality disorder which makes [him] likely to engage in the predatory acts of sexual violence." Id. at 357, 117 S. Ct. at 2080, 138 L. Ed. 2d at 512 (citation and internal quotation marks omitted). Commitment is permitted, regardless of the date of the predicate offense, based on a court's determination of current dangerousness to the public. Id. at 371, 117 S. Ct. at 2086, 138 L. Ed. 2d at 520. Significantly, however, a person cannot be "confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness," and he is entitled to yearly reviews at which the State bears the burden of justifying continued commitment. Id. at 364, 117 S. Ct. at 2083, 138 L. Ed. 2d at 516. The Court in Hendricks

21

found that the statute did not constitute "punishment" under the Ex Post Facto Clause, in part because the sexually violent predator law was comparable to traditional involuntary civil commitment of those suffering from a mental illness.  Id. at 369-71, 117 S. Ct. at 2086, 138 L. Ed. 2d at 520.[7]  According to the Court, "historically," such "nonpunitive detention" of the dangerous mentally ill has not been considered to be punishment.  Id. at 363, 117 S. Ct. at 2083, 138 L. Ed. 2d at 516.

In contrast to the statutes in Smith and Hendricks that are denominated as nonpunitive and civil in nature, parole and probation have historically been viewed as punishment.  See Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S. Ct. 3164, 3168, 97 L. Ed. 2d 709, 717 (1987) ("Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender . . . .'"  (quoting George G. Killinger et al., Probation and Parole in the Criminal Justice System 14 (1976))); United States v. Dozier, 119 F.3d 239, 242 (3d Cir. 1997) ("Supervised release is punishment; it is a deprivation of some portion of one's liberty imposed as a punitive measure for a bad act."); State v. Bowditch, 700 S.E.2d 1, 8 (N.C. 2010) ("An offender's period of parole or probation, and its attendant State supervision, historically have been considered a form of criminal

---

[7] In Hendricks, the Supreme Court did not strictly adhere to the Mendoza-Martinez framework.

punishment."). That parole is "in legal effect imprisonment" is well established. See Anderson v. Corall, 263 U.S. 193, 196, 44 S. Ct. 43, 44, 68 L. Ed. 247, 254 (1923) (stating that although parole is "an amelioration of punishment, it is in legal effect imprisonment"); see also United States ex rel. Nicholson v. Dillard, 102 F.2d 94, 96 (4th Cir. 1939) (stating that parole is "imprisonment in legal effect").

Significantly, the Court in Smith, supra, differentiated between Alaska's sex-offender registry scheme and probation and supervised release. 538 U.S. at 101, 123 S. Ct. at 1152, 155 L. Ed. 2d at 182. The Court noted that, unlike the registration and notification law, probation or supervised release curtailed an individual's right "to live and work as other citizens" without supervision and imposed "a series of mandatory conditions [that] allow the supervising officer to seek the revocation of probation or release in case of infraction." Ibid.

Community supervision for life and its corollary parole supervision for life are merely indefinite forms of parole. We have ruled that community supervision for life "is punitive rather than remedial." Schubert, supra, 212 N.J. at 308. We came to that conclusion despite the fact that "one of the purposes of community supervision for life is to protect the public from recidivism by defendants convicted of serious sexual

23

offenses." Id. at 307-08 (citation and internal quotation marks omitted). As we noted in Schubert, "one of the purposes of incarceration" is public safety, id. at 308, yet no one would seriously argue that -- outside of civil-commitment detention -- imprisonment is nonpunitive because of the remedial benefits of deterrence and safety to the public.

In Schubert, supra, we determined that a trial court could not amend a sexual offender's judgment of conviction to impose community supervision for life, N.J.S.A. 2C:43-6.4 (now called parole supervision for life, L. 2003, c. 267), four years after the offender had successfully completed his probationary sentence. 212 N.J. at 300-01, 313. We concluded in Schubert that increasing a sentence after the defendant has completed serving it "is a violation of a defendant's fundamental rights under the Double Jeopardy Clauses of the United States and New Jersey Constitutions." Id. at 313. What constitutes punishment is no different under either a double jeopardy or ex post facto analysis.[8] Hendricks, supra, 521 U.S. at 369–71, 117 S. Ct. at 2085-86, 138 L. Ed. 2d at 519-21 (holding that because "commitment under the [Kansas Sexually Violent Predator Act] is not tantamount to 'punishment,'" it does not violate either

---

[8] For this reason, SOMA as applied retroactively to Riley arguably violates the Double Jeopardy Clauses, U.S. Const. amend. V; N.J. Const. art. 1, ¶ 11, as imposition of community supervision for life did in Schubert.

24

Double Jeopardy Clause or Ex Post Facto Clause); see also Smith, supra, 538 U.S. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 179 (noting that Mendoza-Martinez factors originated in double jeopardy jurisprudence and "migrated into our ex post facto case law").

C.

Courts in other jurisdictions have addressed whether GPS monitoring of sex offenders constitutes punishment for ex post facto purposes, with varying results. In Cory, supra, the Massachusetts Supreme Judicial Court declared that a law requiring the mandatory GPS monitoring of sex offenders already on probation was "punitive in effect" and therefore violated the Ex Post Facto Clause. 911 N.E.2d at 197. The court weighed the Mendoza-Martinez factors in reaching that outcome. Id. at 195-97. The court found that "[t]he GPS device burden[ed] liberty . . . by its permanent, physical attachment" and "its continuous surveillance," and found that the device was "dramatically more intrusive and burdensome" than a yearly registration requirement. Id. at 196. The court observed that in "no context other than punishment" does the state physically attach -- for a period of years under threat of imprisonment -- a device "without consent and also without consideration of individual circumstances." Id. at 196. The attachment of a GPS

25

monitoring device, according to the court, "is a serious, affirmative restraint."  Ibid.

In contrast to Cory, in Doe v. Bredesen, the United States Court of Appeals for the Sixth Circuit upheld, against an ex post facto challenge, the Tennessee Serious and Violent Sex Offender Monitoring Pilot Project Act, which "authorized the Tennessee Board of Probation and Parole . . . to subject a convicted sexual offender to a satellite-based monitoring program for the duration of his probation."  507 F.3d 998, 1000 (6th Cir. 2007) (emphasis added).

Importantly, unlike the defendants in Cory and Bredesen, Riley had completed the entirety of his sentence and was under no form of supervised release at the time the State subjected him to a regime of GPS monitoring.  In Cory and Bredesen, GPS monitoring became an additional condition to an ongoing probation.  We do not suggest that GPS monitoring may not be added as a condition of parole supervision that is ongoing -- that is, while the offender is still serving his sentence.

Bowditch, supra, 700 S.E.2d 1, is clearly at odds with Cory and the Appellate Division majority in this case.  There, the North Carolina Supreme Court upheld against an ex post facto challenge a statute that provided for GPS monitoring of sexual offenders, regardless of whether the offenders had completed their sentences.  Id. at 3.  The majority ruled that the statute

as a whole was "enacted with the intent to create a civil regulatory scheme" and did not violate the Ex Post Facto Clause. Id. at 13. A three-person dissent sharply disagreed with the majority, finding that "[t]he physical and practical realities of the [GPS monitoring] program . . . transform the effect of the scheme from regulatory to punitive." Id. at 21 (Hudson, J., dissenting).

## VI.

We now apply the principles enunciated in ex post facto jurisprudence to the case before us. Initially, it is important to note the scenarios not implicated here. This is not a case about a defendant who committed a crime after the passage of SOMA or about a defendant who was subjected to the additional condition of GPS monitoring for the duration of his probation or parole. The only question we address is whether a defendant who committed a past offense and completed his sentence before enactment of SOMA can be subjected to the Parole Board's regime of GPS monitoring.

## A.

The Parole Board argues that the 2007 Sexual Offense Monitoring Act was not applied retroactively to Riley's 1986 commission of attempted sexual assault, but prospectively to Riley's Megan's Law Tier 3 high-risk designation in 2009. The Board contends that the Tier 3 designation -- not the offense

27

conduct -- triggered the GPS monitoring and therefore the retroactivity issue is illusory. We reject that argument, as did all members of the appellate panel. Riley, supra, 423 N.J. Super. at 232-34.

The Board's reasoning is not supported by United States Supreme Court jurisprudence. In Johnson v. United States, the Supreme Court engaged in an ex post facto retroactivity analysis of a new law that permitted the extension of a period of supervised release. 529 U.S. 694, 697-701, 120 S. Ct. 1795, 1799-1801, 146 L. Ed. 2d 727, 734-36 (2000). The new law was enacted after the defendant committed the offense for which he was placed on supervised release but before the defendant violated the terms of his earlier-imposed supervised release. Id. at 698, 120 S. Ct. at 1799, 146 L. Ed. 2d at 734. The Supreme Court made clear that penalties that "relate to the original offense" are applied retroactively. Id. at 701, 120 S. Ct. at 1801, 146 L. Ed. 2d at 736. Because the "postrevocation penalties relate[d] to the original offense," an additional term of supervised release under the new law would have applied retroactively. Ibid.

In Poritz, supra, when conducting an ex post facto analysis of the newly enacted Megan's Law, which included a community-notification requirement determined by tier designation, we looked to the date of the original offense as the triggering

28

event.  See 142 N.J. at 20.  Had we selected the tier determination as the starting point, a retroactivity analysis would have been unnecessary.  Similarly, by the Parole Board's reasoning, the United States Supreme Court needlessly conducted an ex post facto analysis in Smith.

Riley's Tier 3 designation was based on his 1986 conviction and other prior sexual offense convictions.  At the Megan's Law hearing, the court made no independent assessment of Riley's current dangerousness unrelated to his prior convictions.  The predicate events responsible for Riley's current regime of GPS monitoring are his 1986 sexual offense and earlier offenses, and therefore the question is whether SOMA can retroactively apply to completed conduct without offending the Constitution.

B.

For purposes of our ex post facto analysis, we accept that the Legislature, in passing SOMA, intended to enact a remedial, regulatory scheme that was civil and nonpunitive in nature. "[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."  Hudson v. United States, 522 U.S. 93, 100, 118 S. Ct. 488, 493, 139 L. Ed. 2d 450, 459 (1997) (citation and internal quotation marks omitted).  After finding that Riley did not present such proof, the appellate panel unanimously concluded that "the Sex Offender Monitoring Act's

express legislative objectives reflect a civil scheme that is primarily regulatory in intent." Riley, supra, 423 N.J. Super. at 237. No appeal was taken from that determination.

VII.

The issue is whether, despite the remedial intent of the Legislature, SOMA's adverse effects are "so punitive either in purpose or effect as to negate the State's intent to deem it only civil and regulatory." Smith, supra, 538 U.S. at 92, 123 S. Ct. at 1147, 155 L. Ed. 2d at 176 (alteration, citation, and internal quotation marks omitted). In other words, if the real world effects of the twenty-four-hour GPS monitoring regime on Riley's life are unmistakably punitive in nature, the Ex Post Facto Clause will bar retroactive application of SOMA. This "adverse effects" analysis requires us to turn to the five Mendoza-Martinez factors considered most relevant by the Supreme Court in Smith.

A.

The first two of the Mendoza-Martinez factors identified in Smith weigh most heavily in our analysis. The first factor is whether "the regulatory scheme[] has been regarded in our history and traditions as a punishment." Id. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 180. The technology that has given rise to SOMA is of relatively recent origin. There are no direct historical analogues to a twenty-four-hour-a-day

30

electronic surveillance that can track an individual's every movement. Nevertheless, the closest analogue to SOMA is parole and, more particularly, parole supervision for life.

Riley, now eighty-one years old, having fully completed his criminal sentence, is under the Parole Board's supervision and subject to regulations it has adopted. He has been assigned a monitoring parole officer. He must notify his parole officer of any change in residence; of any change in employment, including work hours and schedule; of plans to travel outside of the State; and of GPS equipment that is inoperable, lost, or damaged. He must permit his parole officer to enter his home to perform equipment maintenance and "to investigate a report of non-compliance with a condition of the monitoring program." The parole officer must be able to monitor Riley twenty-four hours a day, and to determine when he is moving, at what speed, and in what direction. Riley must always be available to respond to messages sent to him through his GPS tracking device. That requires Riley to have his GPS device charged at all times -- two hours after every sixteen hours of use. He also is responsible for the cost of its repair. Riley cannot travel anywhere his GPS device does not operate or where it cannot be charged within a sixteen-hour period. The failure to comply with any those conditions constitutes a third-degree crime punishable by up to five years in prison. N.J.S.A. 30:4-123.94.

31

This scheme, unlike the reporting and notification requirements of Megan's Law, is similar to a form of supervised release with mandatory conditions that allows a supervising officer -- such as a parole officer -- to seek revocation of the release for a violation.  Cf. Smith, supra, 538 U.S. at 101, 123 S. Ct. at 1152, 155 L. Ed. 2d at 182.  SOMA looks like parole, monitors like parole, restricts like parole, serves the general purpose of parole, and is run by the Parole Board.  Calling this scheme by another name does not alter its essential nature.

SOMA does not share the exact conditions of parole supervision for life.  Cf. N.J.A.C. 10A:71-6.12(d) (defining conditions of parole supervision for life).  In some ways, SOMA is both more and less onerous than parole supervision for life. Nevertheless, SOMA plays a role sufficiently similar to allow the comparison.  Moreover, Riley cannot do anything to alter his Tier 3 (high risk) designation, which is based on his prior convictions.  Unlike the Sexually Violent Predator Act, which permits for yearly review to determine whether the committee continues to pose a danger to the public and which allows for his release if he does not, N.J.S.A. 30:4-27.35 to -27.36, SOMA ensures that Riley's future is static -- he is condemned to wear the electronic monitoring device for the rest of his life.

B.

SOMA, moreover, "imposes an affirmative disability or restraint" -- the second most important Mendoza-Martinez factor in our analysis.  See Smith, supra, 538 U.S. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 180.  That is evident from our discussion that SOMA imposes a regime similar to parole.  If the "affirmative disability or restraint" imposed by a law "is minor and indirect, its effects are unlikely to be punitive."  Id. at 99-100, 123 S. Ct. at 1151, 155 L. Ed. 2d at 181 (citation and internal quotation marks omitted).  On the other end of the spectrum, if "the affirmative disability or restraint" is direct and extreme, then the statute's effects are more likely to be punitive.

Here, the disabilities and restraints placed on Riley through twenty-four-hour GPS monitoring enabled by a tracking device fastened to his ankle could hardly be called "minor and indirect."  Cf. id. at 100, 123 S. Ct. at 1151, 155 L. Ed. 2d at 181.  Riley is tethered to an electronic device that must be recharged every sixteen hours, and therefore he cannot travel to places where there are no electrical outlets.  In addition to the requirement that he tell his parole officer before he leaves the State, Riley cannot travel to places without GPS reception because his tracker will be rendered inoperable and his parole officer will be unable to monitor his whereabouts.  SOMA clearly impinges on the "freedom to travel," which "has long been

33

recognized as a basic right under the Constitution." See United States v. Guest, 383 U.S. 745, 758, 86 S. Ct. 1170, 1178, 16 L. Ed. 2d 239, 249 (1966). SOMA's grant of authority to parole officers to gain access to Riley's home is also an incursion into Riley's Fourth Amendment privacy rights. See State v. Domicz, 188 N.J. 285, 306 (2006) (stating that, generally, if police do not have warrant, person, "in the familiar surroundings of his home, can send the police away without fear of immediate repercussions"). Moreover, the tracking device, permanently strapped to Riley's leg, causes pain when he sleeps.

Even though SOMA's purpose is not to shame Riley, the "effects" of the scheme will have that result. If Riley were to wear shorts in a mall or a bathing suit on the beach, or change clothes in a public locker or dressing room, or pass through an airport, the presence of the device would become apparent to members of the public. The tracking device attached to Riley's ankle identifies Riley as a sex offender no less clearly than if he wore a scarlet letter. His parole officer may also send audible messages to Riley on the tracker that he may receive in a public place. Unlike the Megan's Law registration and notification scheme described in Smith, SOMA's twenty-four-hour surveillance of Riley and onerous restrictions deprive him of freedom of movement and the ability "to live and work as other

34

citizens, with no supervision." Cf. Smith, supra, 538 U.S. at 100-01, 123 S. Ct. at 1151-52, 155 L. Ed. 2d at 181-82.[9]

C.

The remaining Mendoza-Martinez factors discussed in Smith do not alter the ineluctable conclusion that the "effects" of the continuous GPS global monitoring scheme are punitive in nature. Whether SOMA "promotes the traditional aims of punishment" or has a "rational connection to a nonpunitive purpose," Id. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 180, are not decisive factors here. To the extent that SOMA resembles parole, it necessarily embodies aims commonly associated with punishment, including deterrence. On the other hand, "[a]ny number of governmental programs might deter crime without imposing punishment." Id. at 102, 123 S. Ct. at 1152, 155 L. Ed. 2d at 183. Rehabilitation too is a factor both in fashioning a criminal sentence and in certain civil regulatory schemes, such as the Sexually Violent Predator Act. It is difficult to see what rehabilitative benefits SOMA might offer Riley.

---

[9] The Appellate Division dissent and the Board assert that SOMA is "far less restrictive" than the Sexually Violent Predator Act. However, the SVPA has a unique historical basis -- involuntary civil commitment. One cannot claim that parole and probation are not punishment simply because they are less harsh than civil confinement.

Public safety is a prime consideration in the imposition of a criminal sentence, Schubert, supra, 212 N.J. at 307-08, yet public safety is also a driving force for such nonpunitive civil statutes as Megan's Law and the Sexually Violent Predator Act. All in all, these factors are inconclusive in determining whether the statute is punitive or civil in nature. Id. at 307 (noting that statute will not be classified as "remedial rather than punitive because the purpose of the statute is to protect members of the community").

Last, whether SOMA "is excessive with respect to [its nonpunitive] purpose," Smith, supra, 538 U.S. at 97, 123 S. Ct. at 1149, 155 L. Ed. 2d at 180, necessarily depends on whether it falls closer on the scale to traditional forms of punishment, such as parole. The overall objective of SOMA is public safety, which we have observed is present in both punitive and civil remedial schemes.

In the end, we conclude that SOMA's adverse effects are "so punitive . . . as to negate the State's intent to deem it only civil and regulatory." Id. at 92, 123 S. Ct. at 1147, 155 L. Ed. 2d at 176 (alteration, citation, and internal quotation marks omitted); see Bowditch, supra, 700 S.E.2d at 21 (Hudson, J., dissenting) ("The physical and practical realities of the [GPS monitoring] program . . . transform the effect of the scheme from regulatory to punitive."). The retroactive

application of SOMA to George Riley twenty-three years after he committed the sexual offense at issue and after he fully completed his criminal sentence violates the Ex Post Facto Clauses of the United States and New Jersey Constitutions.

VIII.

For the reasons expressed, we affirm the judgment of the Appellate Division, which held that the retroactive application of SOMA to George Riley violates the Ex Post Facto Clauses of the Federal and State Constitutions.  We remand to the New Jersey Parole Board for enforcement of this judgment.

JUSTICE LaVECCHIA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.  CHIEF JUSTICE RABNER and JUSTICES PATTERSON and FERNANDEZ-VINA filed a separate, dissenting opinion.

GEORGE C. RILEY,

     Appellant-Respondent,

        v.

NEW JERSEY STATE PAROLE
BOARD,

     Respondent-Appellant.


     CHIEF JUSTICE RABNER and JUSTICES PATTERSON and FERNANDEZ-VINA, dissenting.

     We dissent substantially for the reasons expressed in Judge Parrillo's thoughtful dissenting opinion.  Riley v. N.J. State Parole Bd., 423 N.J. Super. 224, 246 (App. Div. 2011) (Parrillo, P.J.A.D., dissenting).

SUPREME COURT OF NEW JERSEY

NO. ___A-94___                SEPTEMBER TERM 2011

ON CERTIFICATION TO      Appellate Division, Superior Court


GEORGE C. RILEY,

    Appellant-Respondent,

        v.

NEW JERSEY STATE PAROLE

BOARD,

    Respondent-Appellant.


DECIDED        September 22, 2014

          Chief Justice Rabner                PRESIDING

OPINION BY        Justice Albin

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY        Chief Justice Rabner


| CHECKLIST | AFFIRM/REMAND | REVERSE |
|---|---|---|
| CHIEF JUSTICE RABNER | | X |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | | X |
| JUSTICE FERNANDEZ-VINA | | X |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 4 | 3 |

1