**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3021-17T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BROOKS G. HARRIS,

    Defendant-Appellant.

_____

Argued telephonically October 24, 2019 –
Decided November 27, 2019

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 09-07-0422.

Lee March Grayson, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Lee March Grayson, on the briefs).

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the briefs).

PER CURIAM

Defendant Brooks Harris was convicted of murder and other offenses after a 2010 jury trial. He appeals the trial court's October 30, 2017 order denying his petition for post-conviction relief ("PCR") without an evidentiary hearing. He argues that both his trial attorney and his counsel on direct appeal were constitutionally ineffective in numerous respects. He contends that his conviction should be set aside for a new trial, or, at the very least, the matter should be remanded for an evidentiary hearing on multiple issues.

For the reasons that follow, we affirm the trial court's denial of defendant's petition in all but one respect. We remand this matter for the sole purpose of the trial court conducting an evidentiary hearing, consistent with the Supreme Court's recent opinion in State v. L.H., 239 N.J. 22 (2019), and other case law, to evaluate the voluntariness of defendant's incriminating statements to the police.

As we will discuss, defendant's trial attorney should have requested a Rule 104 hearing on the statements' admissibility before they were presented to the jury. Defendant has raised serious concerns about alleged events occurring during the interval between his first and second recorded police interrogations that, along with certain statements by police during the recorded interrogations,

make out a prima facie (but rebuttable) case of ineffective assistance of counsel and involuntariness.

On all other issues, we sustain the PCR judge's decision.

I.

We incorporate by reference the factual background and procedural history recited more extensively in our opinion on direct appeal. State v. Harris, No. A-6202-09 (App. Div. Oct. 15, 2012), certif. denied, 213 N.J. 538 (2013). We summarize pertinent aspects of that previous history here, and also update the record to include the PCR proceedings.

The State's proofs at the April 2010 trial established to the jury that defendant conspired with Jerry Loatman to kill Jeremy Huff, with whom defendant's wife was in a relationship. Harris, slip op. at 2. On the evening of August 13, 2008, or early the next morning, Loatman and Lee Williams attacked Huff in his home and stabbed him repeatedly. Ibid. Huff died during emergency surgery.

Defendant's Wife's Testimony

In May 2008, defendant's wife, Brenda Harris, began an affair with Huff, a neighbor and friend of defendant. In June 2008, Brenda[1] decided to separate

---

[1] We use Brenda Harris's first name for clarity, intending no disrespect.

from defendant and moved out of their joint residence. Brenda testified at trial that defendant began telling her they "ha[d] to stay together for the kids" and called her "non-stop." According to her testimony, when she told defendant about her relationship with Huff, defendant "reacted very bad, violently."

On July 4, 2008, Brenda was at Huff's home when defendant showed up "banging on the windows." Huff called 9-1-1 and went outside, where the men had a physical altercation. State Trooper Mark Manzo arrived at the residence and observed defendant "standing outside," "shirtless, covered in mud" with scrapes and bruises on him. The trooper later observed Huff in a similar condition. Following this incident, Brenda testified that defendant told her he was going to kill Huff and would "rather talk to [his] kids in jail than to let [her] be with him."

Loatman's Testimony

Loatman testified as a prosecution witness at the trial. He recounted that a few weeks before Huff's murder, defendant told him "he wanted . . . Huff killed because he was messing around with his wife." Loatman had known defendant for approximately one year at that point from working at a tire shop. Defendant was a former employee of the tire shop. Loatman was seventeen years old at the time of Huff's murder, and defendant was age twenty-eight.

Loatman testified that defendant planned to pay him $5,000[2] for killing Huff. Between July 28 and August 14, 2008, defendant placed 125 calls to Loatman, and they had approximately ten to fifteen phone conversations about killing Huff. They also had five in-person conversations outside of Loatman's residence. At some point, Loatman recruited Williams, who was seventeen or eighteen at the time, to participate in the murder as well.

On the morning of August 13, 2008, defendant called Loatman and told him that he wanted Huff killed that night. Defendant was going on vacation with his children the next day, and he did not want his wife alone with Huff. Loatman testified that they discussed Loatman procuring a gun to shoot Huff.

That evening, defendant picked up Loatman and Williams at Loatman's residence and drove them to Huff's residence. The fingerprints of both Loatman and Williams were later identified on defendant's truck. On the way, Loatman told defendant he had been unable to get a gun. The three men decided that Loatman and Williams would use knives to kill Huff.

---

[2] There is a discrepancy as to whether the amount was $5,000 or $500. Loatman testified that defendant was going to pay him and Williams $5,000, but defendant told the police he was going to pay them $500. On direct appeal, we noted that the discrepancy did not affect our analysis. Harris, slip op. at 9 n.8. It also does not affect the PCR issues before us.

A-3021-17T3

According to Loatman, defendant instructed Williams and him on how to approach Huff's residence, and on what to do after the murder was complete. He told them to walk along a guardrail to avoid a motion-activated light, and to enter the home through a window with an air conditioner. Defendant reportedly instructed Loatman and Williams to wait thirty-to-forty minutes before entering the home in order to allow him time to travel to a bar and be seen on camera for an alibi.[3] Defendant told them that Huff would likely be in his bedroom, which was the second door on the left, and that they should take his wallet, phone and keys from the entertainment center and leave the scene in Huff's truck. Defendant also instructed them to contact him when the job was done.

As described by Loatman, defendant dropped Loatman and Williams off a short distance from Huff's residence, and gave them one pair of gloves to avoid leaving fingerprints. He also gave them $50 as a "downpayment" for the murder, with a promise that the rest of the money would follow.

Loatman and Williams approached the residence, waited for about thirty minutes, and then attempted to enter. They were unable to climb through the window with the air conditioner, so Williams climbed through a different window and let Loatman in through the front door. When he opened the door,

---

[3] Surveillance footage of defendant at a bar was played for the jury at trial.

A-3021-17T3

Williams had two knives, one of which he gave to Loatman, and a pair of gloves he found under the deck of Huff's house.

The two men found Huff sleeping in his bedroom. As they stood over him "debating on who was going to stab [him]," Huff woke up and said "don't do this, Brooks." Loatman then "hopped on [Huff] and started stabbing him" in "[h]is head, his neck, [and] his back." Huff struggled to his feet, but was thrown to the ground. Williams joined in the stabbing, and Huff eventually stopped resisting.

Believing Huff to be dead, Loatman and Williams took his car keys, phone, and wallet and drove away in Huff's truck. Investigators later found blood matching Huff's DNA in Huff's truck and on Loatman's underwear.

After leaving in Huff's truck, Loatman sent defendant a text message stating that "the job was done," to which defendant responded asking if Loatman was all right. Loatman and Williams abandoned Huff's truck behind a home in Salem City, "threw the gloves and keys over a wooden fence," and went to Williams's residence to clean up. Before splitting up, they stopped at a Chinese restaurant to evenly split the money defendant had given them.

A-3021-17T3

Huff's Medical Condition and Demise

Huff survived the attack and called 9-1-1. Detective Thomas Daltwas of the New Jersey State Police was one of the first responders, and he testified at trial. Upon entering Huff's residence, Detective Daltwas observed blood "smeared along the wall" and "fecal matter at the front door." He found Huff "slumped over the toilet in the bathroom." Huff had "sustained numerous stabbings," was "in and out of consciousness," "was bleeding," and "had fecal matter all over the front of his body." Daltwas asked if Huff knew who had done this to him, to which Huff gave defendant's name.

A paramedic responded to the scene and also testified at trial. He stated Huff was "coated in blood, pale, diaphoretic" and had "common . . . signs of shock." Before performing a medical procedure that would incapacitate Huff, the paramedic asked Huff who had done this to him. Huff again gave defendant's name. Huff was airlifted to a hospital, but died during emergency surgery at 4:31 a.m. on August 14, 2008. An autopsy revealed that Huff had suffered thirty-eight "sharp injuries," including both stab wounds and incised wounds.

Within hours of the attack on Huff, defendant voluntarily accompanied officers to the police station. Defendant signed a <u>Miranda</u>[4] waiver card. Detectives Robert Gates and Glenn Garrels conducted a recorded interview.

Defendant initially denied any involvement in the stabbing, noting that he had been at the Oakwood Inn in Elsinboro from 11:00 p.m. to 1:30 a.m. Eventually, defendant stated he had hired "two kids" from Salem to "lump [Huff] up." He identified one of the kids as Jarrod, whom he knew from work. He admitted to dropping them off near Huff's residence, paying them $50, and promising another "couple hundred [dollars] as [he] got it." The first recorded interview then ended, and the recording did not resume until about half an hour later.

After the break, defendant admitted to police that he had told "Jerry" that he wanted Huff dead, speaking with Jerry on five-to-ten occasions over several weeks, and promising $500 to kill Huff. He also discussed speaking with Jerry over the phone about getting a gun to kill Huff, picking Jerry and his friend up and bringing them to Huff's house, and the decision to use knives to kill Huff. Defendant further told detectives in the second interview the plan was for Jerry

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

and his friend to take Huff's car after the killing. Defendant said he got a text message from Jerry sometime after midnight, saying "it's done."

<u>Defendant's Testimony</u>

Defendant testified at trial in his own defense. He maintained that he paid Loatman "to beat up" Huff, not to kill him. He testified that he had known Huff for ten years and described him as a close friend. Defendant admitted to dropping Loatman and Williams off near Huff's residence, but claimed he believed they did not have weapons.

Defendant testified that after his first recorded statement to police they questioned him in another room. He stated that he learned Huff had died during that time interval, and he was scared and feared he would not see his children again. Defendant testified that he made his second recorded statement because his "understanding" with the officers was that if he cooperated and admitted to wanting Huff murdered, he would be released.

<u>The Verdict</u>

The jury found defendant guilty of murder (counts one and two), conspiracy to commit murder (counts five and six), conspiracy to commit aggravated assault (count seven), aggravated assault (count eight), burglary (count fifteen), conspiracy to commit burglary (count sixteen), and theft (count

twelve). The jury found defendant not guilty of conspiracy to commit robbery (count nine), robbery (count ten), and conspiracy to commit theft (count eleven).

On the murder counts, the jury was unable to agree as to the aggravating factor of whether defendant "procure[d] the commission of the death of Jeremy Huff by payment or promise of payment of anything of value," also referred to as the "murder-for-hire" question.

<u>Sentencing</u>

On June 1, 2010, defendant was sentenced. Before sentencing defendant, the trial judge heard and denied defendant's pro se motion to relieve trial counsel.

On count one, first-degree murder, the judge sentenced defendant to a fifty-year prison term, subject to an 85% period of parole ineligibility pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, and five years of post-release parole supervision. All the following prison terms were to run concurrent with this sentence. On count five, conspiracy to commit murder, defendant was sentenced to a seventeen-year prison term. He was sentenced to eight-year prison terms on counts fifteen, burglary, and sixteen, conspiracy to commit burglary.

The remaining counts for which defendant was found guilty merged with other counts for sentencing. In sum, defendant was sentenced to an aggregate term of fifty years imprisonment with an 85% parole disqualifier and five years post-release parole supervision.

PCR Petition and Oral Argument

On June 5, 2015, defendant filed a PCR petition through private counsel. The court later permitted defendant's private counsel to withdraw, and new counsel was assigned.

On August 18, 2017, a non-evidentiary hearing on defendant's petition was held. The PCR judge[5] heard oral argument and reserved decision.

On October 30, 2017, the PCR judge issued an order and twenty-five-page written decision denying defendant's petition. This appeal followed.

On appeal, defendant raises the following points for our consideration:

POINT I

THE COURT ERRED IN PROHIBITING DEFENDANT FROM TESTIFYING AS TO WHAT HE WAS TOLD BY INTERROGATING OFFICERS DURING THE PERIOD BETWEEN HIS TWO RECORDED STATEMENTS AND IN CHARGING THE JURY THAT IT MUST EVALUATE THE CREDIBILITY OF THOSE STATEMENTS

---

[5] The PCR judge was not the judge who presided over the trial seven years earlier.

A-3021-17T3

WITHOUT TELLING IT THAT IT MUST ALSO DETERMINE WHETHER THOSE STATEMENTS HAD ACTUALLY BEEN MADE.

POINT II

THE TRIAL JUDGE ERRED IN PERMITTING THE PROSECUTOR TO IMPEACH THE DEFENDANT BASED ON HIS VIOLATIONS OF PROBATION (Not Raised Below).

POINT III

THE TRIAL COURT'S CHARGE ON ACCOMPLICE CULPABILITY WAS INCORRECT SINCE IT DID NOT COMPLY WITH STATE V. BIELKIEWICZ[, 267 N.J. Super. 520 (App. Div. 1993).] (Not Raised Below).

POINT IV

THE SENTENCE IMPOSED UNDER N.E.R.A. – WHICH INCLUDED AN AGGREGATE SENTENCE OF FIFTY YEARS OF WHICH HE MUST SERVE 85% BEFORE BEING ELIGIBLE FOR PAROLE – WAS MANIFESTLY EXCESSIVE.

POINT V

REVERSAL IS REQUIRED BECAUSE OF THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH IN POINTS I THROUGH III, SUPRA.

A-3021-17T3

## II.

### A.

Post-conviction relief is our State's "analogue to the federal writ of habeas corpus." State v. Jones, 219 N.J. 289, 310 (2014). It is "a defendant's last opportunity to raise a constitutional challenge to the fairness and reliability of a criminal verdict in our state system." State v. Feaster, 184 N.J. 235, 249 (2005). To be eligible for PCR, a defendant "must establish the right to such relief by a preponderance of the credible evidence." State v. Preciose, 129 N.J. 451, 459 (1992).

Since the PCR proceedings in this case did not involve an evidentiary hearing, the findings of the PCR judge do not warrant the deference normally accorded to findings "substantially influenced" by a trial judge's "opportunity to hear and see the witnesses and to have the 'feel' of the case." State v. Taccetta, 200 N.J. 183, 194 (2009) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Moreover, an appellate court is "not required to give 'deference to the legal conclusions of the PCR court.'" Id. at 195 (quoting Feaster, 184 N.J. at 278). We therefore review the PCR judge's decision de novo.

B.

All of defendant's PCR arguments allege that his former counsel was constitutionally ineffective in various respects. We apply well-settled legal principles to those claims.

A criminal defendant's right to counsel, under the Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution, includes the right to adequate legal advice. Strickland v. Washington, 466 U.S. 668, 686 (1984); State v. Fritz, 105 N.J. 42, 58 (1987). To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy a two-part test. "First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid.

In reviewing such claims of ineffectiveness, courts apply a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

15

Strickland, 466 U.S. at 690. "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy . . . ." Fritz, 105 N.J. at 54 (1987) (citation omitted); see also State v. Echols, 199 N.J. 344, 357-59 (2009).

Often a PCR court can evaluate claims of attorney ineffectiveness without the need to conduct an evidentiary hearing. To obtain an evidentiary hearing to explore such ineffective assistance claims, a defendant must make a prima facie showing of deficient performance and actual prejudice. Preciose, 129 N.J. at 462-63. "When determining the propriety of conducting an evidentiary hearing, the PCR court should view the facts in the light most favorable to the defendant." Jones, 219 N.J. at 311 (citing State v. Marshall, 148 N.J. 89, 158 (1997)); see also Preciose, 129 N.J. at 462-63.

With one critical exception, the PCR judge correctly applied these principles in rejecting defendant's numerous ineffectiveness claims. Aside from that singular exception, defendant has not established a prima facie case under the Strickland test, the claims are procedurally barred under the Rules of Court, or both. We therefore affirm the rejection of those remaining contentions for the sound reasons articulated in the PCR judge's detailed opinion.

We focus our discussion and analysis on the one claim of ineffectiveness that has potential merit, and which necessitates a remand for a hearing.

C.

As we previously noted, defendant provided two recorded statements to the police on the morning of August 14, 2008. His first statement began at 5:22 a.m. At the outset of the first recording, Detective Robert Gates verified that defendant had been given <u>Miranda</u> warnings at his mother's home. Detective Gates then reviewed defendant's rights with him again, and verified that defendant did not have any questions.

During his first statement, defendant admitted to paying two young men to "lump up" Huff, apparently signifying that he simply wanted Huff beaten up. He did not admit in his first statement to asking the young men to kill Huff.

The first recorded statement ended at 6:43 a.m. At that point, there is an unrecorded interval of about half an hour.

The second recorded statement began at 7:12 a.m., after defendant was again reminded of his <u>Miranda</u> rights. During the second statement, defendant admitted that he paid Loatman and another person to kill Huff. As he did so, defendant stated, "I just feel like I'm diggin' the hole deeper, feel like I'm just gettin' myself in more trouble." Near the end of the second recording, defendant

agreed that the detectives did not threaten or coerce him, and they had treated him respectfully.

Defendant contends that during the interval between the two recorded interrogations, he was pressured by police to say that he had hired the two young men to kill Huff. At trial, defendant testified that during the break in the recording he was interrogated by the detectives in a different room. According to defendant, the detectives led him to believe that if he admitted to having Huff killed, he would be released.

At the beginning of this testimony, the prosecutor objected to defendant's trial counsel asking what the detectives had told defendant. The following colloquy took place:

> THE PROSECUTOR: That's hearsay, Judge. The appropriate time to bring that out would be cross-examination of the detectives that did the interview.
> There were no questions asked about that. This guy can't, at this point, testify that he (inaudible).
>
> THE COURT: He can't testify as to – your argument is that he can't testify as to what the officers said to him?
>
> THE PROSECUTOR; Testify to – yes.
>
> DEFENSE COUNSEL: Well, the whole subject matter goes to declarations against interest generally, Judge.

THE COURT: Whose declarations against interest?

DEFENSE COUNSEL: Him.

THE COURT: Yeah, but he still can't testify as to what the officers said to him. That doesn't fit any of the exceptions to the hearsay rule, I don't think.

DEFENSE COUNSEL: Judge, it appears that way, however, I think more of a broader interpretation should be afforded this Defendant.

THE COURT: Under?

DEFENSE COUNSEL: Considering that the statements that occurred and what occurred between those two statements is all part and parcel of the interview and the statement process and I think it should be allowed to be asked.

THE COURT: Well, you could have asked the officers what they asked him during that time frame and you chose not to.

DEFENSE COUNSEL: (inaudible). I wouldn't have got the answer I wanted so I wasn't about to ask.

THE COURT: Well, I'm not going to let – then I'm not going to let you ask this witness to say what they said so that you can get the answer that you want.

DEFENSE COUNSEL: Well, there's going to be obviously different answers to different things. What the truth is, is for the jury to decide.

THE COURT: But not from objectionable hearsay. I'm going to sustain the objection.

A-3021-17T3

Defendant then went on to testify on direct examination about his "understanding" with the police before his second recorded statement:

> Q. Did you believe the State would let you – the police would let you go if you cooperated?
>
> A. Yes.
>
> Q. And you feared that you would never see your children again?
>
> A. Yes.
>
> Q. <u>Was it your understanding that if you cooperated, that you would be released</u>?
>
> A. <u>Yes</u>.
>
> Q. You would be able to see your children?
>
> A. Yes.
>
> Q. Is that why you gave the statement –
>
> A. Yes.
>
> Q. – that you wanted the gentleman killed?
>
> A. Yes.
>
> Q. Is that the truth?
>
> A. No.
>
> [(emphasis added)].

After this, the prosecution recalled Detective Gates to rebut defendant's testimony. In rebuttal, Gates recalled that defendant was brought outside to have a smoke during the break in the recordings. Gates asserted that he did not say anything to defendant during the break. Gates further testified that he "absolutely" did not suggest to defendant that he would be allowed to leave if he admitted to killing Huff.

Both of defendant's police statements were played for the jury at trial. Notably, the jury requested during their deliberations that defendant's second statement be replayed. Defendant's counsel requested that the first statement be played as well, but the judge denied that request. The second statement was then played for the jury.

Defendant's argument largely focuses on the break during his recorded statements to the detectives, during which time he alleges the detectives interrogated him, without being recorded, in a different room. He contends that representations of the detectives during this alleged off-the-record interrogation made his second statement involuntary. As such, he argues that his trial counsel should have filed a motion to suppress the statement, and the trial court should thereafter have conducted a Rule 104 hearing as to its voluntariness.

The "[v]oluntariness of a confession or other inculpatory statement by an accused must always be established [by the State] at a N.J.R.E. 104(c) hearing before it can be introduced into evidence at trial." State v. Scott, 398 N.J. Super. 142, 153 (App. Div. 2006), aff'd o.b., 193 N.J. 227 (2008) (quoting Biunno, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 104 (2006)); see also State v. Miller, 76 N.J. 392, 404-05 (1978).

N.J.R.E. 104(c) prescribes, in pertinent part:

> (c) Preliminary hearing on admissibility of defendant's statements. Where by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of persuasion as to the admissibility of the statement is on the prosecution. If the judge admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible. If the judge subsequently determines from all of the evidence that the statement is not admissible, the judge shall take appropriate action.
>
> [N.J.R.E. 104(c) (emphasis added).]

In State v. W.B., 205 N.J. 588 (2011), the Supreme Court made clear that:

> the State has the affirmative duty to prove – in New Jersey by proof beyond a reasonable doubt . . . both that the defendant's statement was voluntary and, if custodial, that the defendant was advised of his rights

22

and knowingly, voluntarily and intelligently waived them.

[Id. at 602 n.3 (citations omitted); see also L.H., 239 N.J. at 27 (setting out the State's burden of proof)].

Counsel on appeal have stipulated that no Rule 104 hearing ever took place in this case. On April 13, 2010, the trial judge indicated that he had set that morning aside for Rule 104 hearings, but there is no discussion in the transcript about voluntariness issues. Later that day, the prosecutor noted that he would play the defendant's statements to the jury "once I have [them] authenticated", and would have a transcript prepared. Again, there was no request by defense counsel for a Rule 104 hearing.

Before the jury heard the two recorded statements, the following colloquy took place:

> DEFENSE COUNSEL: Judge, I have no objection to the Miranda Card and the rights being given and the tape being given.
> However, my concern goes to the hiatus time, and maybe it isn't the appropriate objection at this time and maybe I'm jumping way ahead.
>
> THE COURT: There was no – well, there was no Miranda motion filed in this case; was there?
>
> DEFENSE COUNSEL: I'm not – I have no problem with that. The rights were in fact given and waived. We concede all that.

But there is <u>a great time distance between the time he, that is Mr. Harris, went to police headquarters and the time of the Miranda rights being given</u>.

There's a big gap. That may well impact upon the validity of the tape that was obtained.

THE COURT: <u>Didn't that require</u>, under our court rules, prior to pretrial conference and entering the Pretrial Memorandum, Trial Memorandum, <u>for you to file a motion if you had any of those objections</u>?

<u>So that the Court would have taken testimony and made a ruling as to whether the statement, even though Miranda warnings were given, was tainted and therefore inadmissible</u>?

DEFENSE COUNSEL: <u>I have no objections</u>, Judge, to what you said and <u>I agree 100 percent</u>. My arguments will be made to the trooper and to the jury, which I am certainly permitted to do. <u>I can raise Miranda issues to the jury at any time</u>.

THE COURT: <u>I'm not suggesting that you can't</u>.

DEFENSE COUNSEL: No. Judge, under those circumstances, <u>I see the way this is going and I'm not disputing what you say</u> –

THE COURT: Okay.

DEFENSE COUNSEL: -- under the circumstances. This can be played.

THE COURT: I mean, certainly, <u>you have the right to argue to the jury time frames</u>, the [police] tactics, if you would like to speak – so to speak, to the jury.

And that they impact on the credibility of the statement. That's the law, as I understand it. <u>But the</u>

> issue as to whether the jury's going to hear it all I would think has been decided by the fact that there was no Miranda Motion filed and no ruling by the Court.

[(Emphasis added)].

The relevant substantive law on this issue is clear. Due process requires the State "prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." L.H., 239 N.J. at 42 (quoting State v. Knight, 183 N.J. 449, 462 (2005)). Courts determine voluntariness under a "totality of the circumstances" analysis. Ibid. Relevant factors to the analysis include "'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved,' as well as previous encounters with law enforcement." Id. at 43 (quoting State v. Hreha, 217 N.J. 368, 383 (2014)).

In L.H., the Supreme Court found that a twenty-six-year-old defendant's statement was not voluntary beyond a reasonable doubt, because "the detectives overbore [the] defendant's will by false promises of leniency that assured counseling instead of incarceration, by representations that conflicted with the Miranda warnings, and by minimization of the gravity of the offenses." Id. at

The defendant in <u>L.H.</u> was arrested at 2:30 a.m., and a three-hour interrogation began at 5:31 a.m. <u>Id.</u> at 30. During the interrogation, the detectives promised the defendant counseling, indicated he would not go to jail if he cooperated, and told him "the truth would set him free." <u>Id.</u> at 28.

In <u>L.H.</u>, the Court recognized that "[o]ur jurisprudence even gives officers leeway to tell some lies during an interrogation," and officers can appeal to a suspect's "sense of decency" and urge a suspect "to tell the truth for his own sake." <u>Id.</u> at 26 (citing <u>State v. Galloway</u>, 133 N.J. 631, 655 (1993); <u>Miller</u>, 76 N.J. at 405). However, they found "certain lies . . . may have the capacity to overbear the suspect's will and to render a confession involuntary." <u>Id.</u> at 27. An example of such lies "are false promises of leniency that, under the totality of the circumstances, have the capacity to overbear a suspect's will." <u>Ibid.</u>

Although the record on voluntariness is not fully developed, this case has many apparent similarities to <u>L.H.</u> During defendant's first recorded statement, the detectives repeatedly stated that Huff was not dead and implied he was not too seriously injured. This is despite the fact that Huff died during emergency surgery at 4:31 a.m., nearly an hour before the detectives began the recorded questioning of defendant.

At the outset of the first recorded statement, Detective Gates said that State Troopers talked to Huff at the hospital and he had "some superficial injuries." The detective implied that Huff may also be in trouble, saying "just because he's the one in the hospital now doesn't mean he's off the hook for what happened tonight." The detective also said, "[F]or all we know, you went out there to talk to [Huff], he fuckin' came after you first, you know what I'm sayin'? Like that's what we, that's what, that's what we need to clear up before you get fuckin' your ass thrown in the ringer here."

Further, Detective Garrels stated to defendant that this was not a "serious" case and that Huff was "at Cooper [Hospital], he's gettin' stitched up, we're not lookin' at a fuckin' homicide or anything here, it's, it's not a big deal." Garrels also said "while we're in this room, me and [Detective] Gates, we, we have a, a lot of discretion of what happens, through the whole investigation. As soon as we leave here and then you not tellin your side of the story, ha, ha we, we only have one choice and that's to go with what the victim tells us." Garrels told defendant that Huff would probably be out of the hospital by the next day and they would get a statement from him.

In addition, Detective Gates stated the detectives had discretion while they were talking with defendant, and were trying to minimize the trouble defendant

faced. Gates also brought up defendant's children often, and emphasized that defendant just wanted to raise his kids.

Defendant testified that he found out Huff was dead during the break between the two interrogations. However, in defendant's second statement, the following exchange took place, which adds confusion to the record about the subject:

> Q: But you got, but you, <u>they went there to kill 'em</u>. Right? Was that the plan?
>
> A: No audible response.
>
> Q: Yes?
>
> A: Yeah.
>
> Q: Okay.
>
> A: <u>I'm glad they didn't.</u>
>
> [(Emphasis added)].

If, in fact, the police had misled defendant about whether Huff was still alive, or failed to correct a misapprehension about his status, defendant might have worried that Huff would have testified against him at a future trial. Such a concern might have affected his willingness to be more forthcoming and cooperative with the police.

Beyond these arguably misleading facets of the detectives' questioning techniques, the timing of the interrogations here might also affect the voluntariness analysis. Defendant was taken into custody at his mother's home at some time in the morning after Huff's death. The first recording starts at 5:22 a.m. and the second recording ends at 7:50 a.m. It is unclear if or how much defendant slept before being detained. He was at a bar the night before, and apparently went to his mother's home after police responded there and she called him. Based on defendant's first statement to the detectives, it appears he went to his mother's home straight from the bar.

The admission of defendant's incriminating statements arguably could have affected the jury's verdict. The second recorded statement was a key piece of evidence in the State's case, because it contained defendant's confession to a killing and not just a beating. Furthermore, the jury seemed to consider the second statement carefully, as they requested to hear it again during their deliberations.

The PCR judge rejected defendant's ineffectiveness claims concerning the police interrogation, essentially because the judge regarded trial counsel's failure to request a <u>Rule</u> 104 hearing to be inconsequential. The judge

specifically found defendant "had failed to establish that a motion to suppress his statement[s] would have been successful if filed."

With all due respect to the PCR judge, this analysis places too heavy a burden on defendant in order to obtain an evidentiary PCR hearing. All that a PCR petitioner needs to show to get a hearing is a prima facie case, not a clear winner. As the Supreme Court stressed in Jones, 219 N.J. at 311, when deciding whether a defendant is entitled to an evidentiary hearing, the PCR court must "view the facts in the light most favorable to the defendant." Viewed here through that prism, we are satisfied defendant had presented such a prima facie case under the two-part Strickland test.

As to the first prong of Strickland – requiring deficient performance by counsel – defendant has presented a strong argument that his trial attorney was remiss in not requesting a Rule 104 hearing on voluntariness. The case law we have cited above, including L.H., makes clear that the State has a burden of establishing, before the jury hears evidence of a defendant's confession, that the defendant's statement was voluntary. L.H., 239 N.J. at 42. A Rule 104 hearing would have been the proper setting to develop the record on that critical requirement. See N.J.R.E. 104(c) (prescribing such hearings).

The trial court chastised defendant's trial counsel for not moving to suppress his client's incriminating statements, which would have enabled the court to have the pertinent circumstances on voluntariness fleshed out at a pretrial hearing. In response, defense counsel vaguely suggested he had "no objections" to the lack of a motion hearing, and that he instead planned to make arguments of involuntariness to the jury.

Defense counsel's tactical justification for bypassing a <u>Rule</u> 104 hearing is not self-evident. Perhaps counsel expected he would lose the <u>Rule</u> 104 hearing and did not want to preview his jury arguments of involuntariness to the prosecution prematurely. Or perhaps counsel thought his client's account of alleged police coercion and deception would be more compelling before the jury if it had not already been dissected at a <u>Rule</u> 104 hearing outside of the jury's presence. These are certainly possible explanations, but without an evidentiary hearing – ideally with testimony from trial counsel – they are essentially supposition.

Defendant himself was not required to testify at a <u>Rule</u> 104 hearing. Instead, the detectives might have testified, providing defense counsel with potential fodder to use on cross-examination at trial. And, even if defendant did

testify at a <u>Rule</u> 104 hearing, the State's examination of him at a hearing might have enabled defense counsel to be better prepared for his testimony at trial.

The State does not refute that holding a <u>Rule</u> 104 hearing before defendant's incriminating statements were admitted would have been appropriate. The State suggests the lack of a hearing does not matter, because the detectives and defendant each testified at trial, and they recounted the events of the successive interrogations. But that trial testimony is incomplete in several respects, and does not fully substantiate what occurred during the half-hour gap between the two recordings.

Moreover, it was not the jury's function to decide if defendant's incriminating statements were admissible, but the trial judge's function. <u>See</u> N.J.R.E. 104(c). By skipping over a vital step of the process, defense counsel lost the benefit of the judge's important gatekeeping role, and the possibility the judge might have excluded or limited portions of defendant's admissions.

In sum, defendant has made a sufficient prima facie showing of counsel's deficient performance under <u>Strickland</u> prong one.

Further, defendant also has presented a prima facie case of <u>Strickland</u> prong two, i.e., actual prejudice. The PCR judge found this prong was not met because the judge felt defendant would have been unsuccessful if he had tried

to block the admission and the incriminating statements. Again, with all due respect to the PCR judge, such an assessment that the alleged poor lawyering made no difference is premature. An evidentiary hearing should have fleshed out the record on the subject, particularly since no <u>Rule</u> 104 hearing was ever conducted.

Defendant has not presented fanciful concerns of involuntariness. If his contentions are truthful, the police in this case repeatedly cajoled and misled him into admitting in the second interview that he had done far more than request to have Huff "lumped up" but, more egregiously, to have Huff killed. Such a powerful recorded admission of guilt – which the jury asked to have replayed before returning their verdict – may have tipped the balance in deliberations, although the strength the State's other proofs (such as Loatman's testimony) surely would also be a factor.

We are mindful that many years have passed since the operative events. Memories have surely faded. Even so, we will not presume that a <u>Rule</u> 104 hearing would be a waste of time. Given the very lengthy prison term defendant is now serving, the stakes justify obtaining a full record and detailed judicial findings of fact on the voluntariness of his admissions.

That said, we do not intimate any views on the ultimate merits of the voluntariness issues. We merely direct that a hearing be held. Following the outcome of that hearing, either party may file a new appeal with this court if desired.

D.

As noted above, we otherwise affirm the PCR judge's remaining findings, both as to defendant's conviction and also his sentence, which he unpersuasively claims is disproportionate to the shorter sentence of Loatman, who cooperated with the State.

To the extent they are not mentioned explicitly, any and all other arguments presented by defendant lack sufficient merit to warrant our discussion. R. 2:11-3(e)(2).

Affirmed in part, vacated in part, and remanded in part for an evidentiary hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3021-17T3